**FILED**

APR 1 5 2026

**U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| RAYMOND PORTER, JR., | ) |
| DAVID HOLMON, | ) |
| MONICA BUTLER, | ) |
| DANA KELLY, | ) |
| ALEXANDER SAMPSON, and | ) |
| LATRICE DAVIS, | ) |
| | ) |
| Defendants. | ) |

**4:26-CR-00174-CMS/JMB**

## INDICTMENT

The Grand Jury charges that, at all times relevant to this Indictment:

### OVERVIEW

1.      The defendants, **RAYMOND PORTER, JR., DAVID HOLMON, MONICA BUTLER, DANA KELLY, ALEXANDER SAMPSON**, and **LATRICE DAVIS**, together with others known and unknown to the Grand Jury, agreed to and did participate in a scheme to submit fraudulent loan applications to the United States Small Business Administration (the "SBA") and third-party SBA lenders for the purpose of fraudulently obtaining COVID-19 loan money through federal loan programs that were designed to provide emergency financial assistance to American small businesses during the height of the pandemic, which President Donald J. Trump declared a major disaster and emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

2.      In total, through their scheme, the defendants and their confederates fraudulently obtained more than $8 million in federal COVID-19 loan money to which they were not entitled.

## THE DEFENDANTS

### *Defendant Porter*

3.    The defendant, **RAYMOND PORTER, JR.** ("Defendant Porter"), resided within the Eastern District of Missouri.

4.    Defendant Porter was a member of a business known as Design Real Estate Solutions LLC d/b/a Heartland POS d/b/a Design Retail Equipment Solutions ("Design Retail").

5.    Defendant Porter was the manager of a business known as Hazelwood Auto Center LLC ("Hazelwood Auto").

6.    Defendant Porter was a member of a business known as State Street Phillips LLC ("State Street").

7.    Defendant Porter was the registered agent of a business known as Unlimited 66 LLC ("Unlimited 66").

### *Defendant Holmon*

8.    The defendant, **DAVID HOLMON** ("Defendant Holmon"), resided within the Eastern District of Missouri.

9.    Defendant Holmon was a member of a business known as Davaire Brands, LLC ("Davaire Brands").

10.    Defendant Holmon was a member of a business known as Mad Bird 1 LLC ("Mad Bird").

11.    Defendant Holmon was a member of a business known as Mezzanine 81 LLC ("Mezzanine").

12.    Defendant Holmon purported to operate under a sole proprietorship known as OMG Labs.

2

#

*Defendant Butler*

13.    The defendant, **MONICA BUTLER** ("Defendant Butler"), resided within the Eastern District of Missouri and the Southern District of Illinois.

14.    Defendant Butler was a member of a business known as The Butler Group (LLC) ("Butler Group").

15.    Defendant Butler was a member of a business known as Echelon Media Production LLC ("Echelon Media").

16.    Defendant Butler was the incorporator of a business known as Gospel Music Hall of Fame, Inc. ("Gospel Music Hall of Fame").

*Defendant Kelly*

17.    The defendant, **DANA KELLY** ("Defendant Kelly"), resided within the Eastern District of Missouri.

18.    Defendant Kelly was the registered agent of a business known as Reign Restaurant LLC ("Reign").

19.    Defendant Kelly was the registered agent of a tax preparation business known as The Firm D&B LLC ("The Firm").

*Defendant Sampson*

20.    The defendant, **ALEXANDER SAMPSON** ("Defendant Sampson"), resided within the Eastern District of Missouri.

21.    Defendant Sampson, along with Defendant Kelly, was a signatory on Reign's bank accounts.

3

#

### *Defendant Davis*

22.     The defendant, **LATRICE DAVIS** ("Defendant Davis"), resided within the Eastern District of Missouri.

23.     Defendant Davis was the registered agent of a business known as Distinq'd Companies LLC ("Distinq'd").

24.     Defendant Davis was the registered agent of a business known as The Headliner's LLC ("Headliner's").

25.     Defendant Davis was the registered agent of a business known as LA'z Unique Whips & Towing, Incorporated ("LA'z Unique Whips").

## COVID-19 LOAN PROGRAMS

26.     The Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was a federal law enacted in or around March 2020. The CARES Act was the largest economic stimulus package in United States history and was designed to, among other things, provide emergency funding to American small businesses affected by the COVID-19 pandemic.

27.     The CARES Act established a new SBA loan program known as the Paycheck Protection Program (the "PPP") and made certain changes to a preexisting SBA loan program known as the Economic Injury Disaster Loan ("EIDL") program, including changes that expanded the types of small businesses eligible for COVID-19 EIDL loans.

### *PPP Loans*

28.     PPP loans were fully forgivable loans available to eligible small businesses that needed financial assistance to stay in operation and keep their workers employed during the COVID-19 pandemic.

4

29.     The types of small businesses eligible for PPP loans included businesses and nonprofit organizations with not more than 500 employees, as well as self-employed individuals and individuals who operated under a sole proprietorship or as an independent contractor.

30.     While the PPP was administered by the SBA, PPP loans were processed, approved, and funded by third-party SBA lenders that participated in the PPP.

31.     To obtain a PPP loan, a small business had to submit to a third-party SBA lender a PPP loan application that was signed by an authorized representative of the business.

32.     The PPP loan amount for businesses and non-profit organizations with employees was based on their average monthly payroll costs during either 2019 or 2020. The PPP loan amount for self-employed individuals and individuals who operated under a sole proprietorship or as an independent contractor was based on their gross income from either 2019 or 2020. The business's authorized representative was required to provide this information in the business's PPP loan application, along with supporting documentation, such as federal tax documents that the business had filed or intended to file with the Internal Revenue Service (the "IRS").

33.     As part of the PPP loan application, the business's authorized representative was required to acknowledge the PPP rules and to make certain affirmative certifications as a condition of obtaining the PPP loan. Among other things, the authorized representative was required to certify that: (a) the business was in operation on February 15, 2020; (b) current economic uncertainty made the loan request necessary to support the ongoing operations of the business; (c) all loan proceeds would be used only for specified business-related purposes, such as maintaining payroll and making payments for rent, utilities, and operations expenses; and (d) the information provided in the loan application and in all supporting documents was true and accurate in all material respects.

#

34.    Once a small business submitted a PPP loan application, the third-party SBA lender processed it. As part of processing the loan application, the lender transmitted data from the application, including information supplied by the business's authorized representative and the total amount of the loan, to the SBA by means of interstate wire transmission.

35.    If the PPP loan application was approved, the third-party SBA lender funded the PPP loan with its own money by electronically transferring the loan proceeds to the borrower-business's bank account by means of interstate wire transmission. To encourage lenders to participate in the PPP and fund PPP loans, the SBA fully guaranteed the loans. Generally, this meant that, if the borrower-business defaulted on repaying the loan, the SBA would purchase the borrower-business's debt from the lender and take on the responsibility of repaying the loan.

36.    A small business that obtained a PPP loan (referred to as a "First Draw" PPP loan) could apply for and obtain a second PPP loan (referred to as a "Second Draw" PPP loan) by submitting to a third-party SBA lender a Second Draw PPP loan application that was signed by an authorized representative of the business.

37.    In addition to providing the same information and making the same certifications as required for the First Draw PPP loan application, in the Second Draw PPP loan application, the business's authorized representative was further required to certify that, among other things, the business had used the full amount of its First Draw PPP loan only for eligible expenses.

38.    A small business that obtained a PPP loan could seek to have the principal and interest owed on the loan fully forgiven by submitting to the third-party SBA lender that funded the loan a PPP loan forgiveness application that was signed by the business's authorized representative.

6

#

39.    In the forgiveness application, the business's authorized representative was required to provide the amount of the PPP loan that the business had spent on payroll costs and to certify that, among other things, the information provided in the application was true and correct in all material respects.

40.    If the forgiveness application was approved by the third-party SBA lender, such that the loan was fully forgiven, then the SBA repaid to the lender the principal and interest owed on the loan, which resulted in the borrower-business owing nothing and having no obligation to repay the lender.

### COVID-19 EIDL Loans

41.    COVID-19 EIDL loans were repayable loans with borrower-friendly terms available to eligible small businesses that were financially unable to pay their ordinary and necessary operating expenses due to economic hardship caused by the COVID-19 pandemic.

42.    The types of small businesses eligible for COVID-19 EIDL loans included businesses with not more than 500 employees, nonprofit organizations, and individuals who operated under a sole proprietorship or as an independent contractor.

43.    Unlike PPP loans, which were processed, approved, and funded by third-party SBA lenders, COVID-19 EIDL loans were processed, approved, and funded directly by the SBA and were not eligible for forgiveness.

44.    To obtain a COVID-19 EIDL loan, a small business had to submit to the SBA a COVID-19 EIDL loan application that was signed by an authorized representative of the business. All COVID-19 EIDL loan applications had to be submitted online by means of interstate wire transmission.

\#

45.     The maximum COVID-19 EIDL loan amount increased over time. The maximum COVID-19 EIDL loan amount initially was $150,000, increased to $500,000 on or about April 6, 2021, and then increased again to $2 million on or about October 8, 2021. As the maximum COVID-19 EIDL loan amount increased, small businesses that previously obtained a COVID-19 EIDL loan could submit to the SBA a modification request to increase their original loan amount.

46.     The COVID-19 EIDL loan amount for small businesses was based on their gross profit—equal to gross revenues minus cost of goods sold—during the 12 months prior to January 31, 2020. The business's authorized representative was required to provide this information, as well as other information, such as the name, date of birth, social security number, and email address of the business's owner, as well as the business's number of employees as of January 31, 2020, in the business's COVID-19 EIDL loan application.

47.     On some occasions, the SBA required the business's authorized representative to submit with the business's COVID-19 EIDL loan application certain supporting documentation, such as bank statements, invoices, and federal tax documents that the business had filed or intended to file with the IRS.

48.     As part of the COVID-19 EIDL loan application, the business's authorized representative was required to certify, under penalty of perjury, that all information contained in, and submitted with, the loan application was true and correct.

49.     The COVID-19 EIDL loan application contained a section that stated, "[i]f anyone assisted you in completing this application, whether you pay a fee for this service or not, that person must enter their information below." In that section, the person who assisted the applicant-business in completing the loan application, commonly referred to as a "preparer," was

8

required to provide their name, the name of their business, their phone number, their address, and the amount of the fee that they had charged or agreed upon with the applicant.

50.    After a small business's COVID-19 EIDL loan application was submitted, and before a decision whether to approve or deny the loan application was made, the applicant-business could request and obtain up to $15,000 in "advance" payments from the SBA, which could be used for the same purposes as a PPP loan and did not have to be repaid even if the loan application was subsequently denied. The SBA, through the United States Treasury, electronically transferred advance payments to the applicant-business's bank account by means of interstate wire transmission.

51.    If the COVID-19 EIDL loan application was approved, the SBA required the borrower-business, through its authorized representative, to sign a loan authorization and agreement as a condition of obtaining the COVID-19 EIDL loan. As part of that agreement, the business's authorized representative was required to promise that, among other things, the business would use all the loan proceeds solely as working capital to alleviate economic injury caused by the COVID-19 pandemic.

52.    Once the COVID-19 EIDL loan application was approved and the borrower-business provided the SBA with all required documentation, such as the signed loan authorization and agreement, the SBA, through the United States Treasury, electronically transferred the loan proceeds to the business's bank account by means of interstate wire transmission.

9

## COUNT 1
### (Conspiracy to Commit Wire Fraud: 18 U.S.C. § 1349)

53. The above paragraphs are hereby realleged and incorporated by reference.

54. Beginning and ending at an exact time unknown, but including between in or around March 2020 and in or around December 2024, within the Eastern District of Missouri and elsewhere, the defendants,

**RAYMOND PORTER, JR.,**
**DAVID HOLMON,**
**MONICA BUTLER,**
**DANA KELLY,**
**ALEXANDER SAMPSON,** and
**LATRICE DAVIS,**

voluntarily and intentionally combined, conspired, confederated, and agreed with one another and others, known and unknown to the Grand Jury, to commit wire fraud in violation of Title 18, United States Code, Section 1343, in that they agreed to participate in a scheme and artifice to defraud the SBA and third-party SBA lenders, and to obtain money from the SBA and third-party SBA lenders by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, in relation to, and involving benefits authorized, transported, transmitted, transferred, disbursed, and paid in connection with, a presidentially declared major disaster and emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Title 42, United States Code, Section 5122)), all in violation of Title 18, United States Code, Section 1349.

### *The Object of the Conspiracy*

55. The object of the conspiracy to commit wire fraud was to fraudulently obtain COVID-19 loan money by submitting to the SBA and third-party SBA lenders fraudulent PPP and

10

#

COVID-19 EIDL loan applications that contained materially false representations and promises and concealed material facts.

### The Manner and Means of the Conspiracy

It was part of the conspiracy to commit wire fraud that:

56.    Defendant Porter and Defendant Holmon, with the assistance of Defendant Davis, worked together to prepare and submit fraudulent PPP and COVID-19 EIDL loan applications for small businesses, including for their own businesses and for the businesses of their confederates, such as Defendant Butler, Defendant Kelly, and Defendant Sampson.

57.    Among other methods of communication, Defendant Davis used the email account latrice.pppmoney@gmail.com to communicate with Defendant Porter and Defendant Holmon regarding the fraudulent PPP and COVID-19 EIDL loan applications that the three of them prepared and submitted for small businesses.

58.    In exchange for preparing and submitting fraudulent PPP and COVID-19 EIDL loan applications for their confederates' small businesses, Defendant Porter and Defendant Holmon charged their confederates fees that were to be paid from the loan proceeds—typically between 10-20% of the proceeds—if their confederates' fraudulent loan applications were approved and funded. To conceal that those payments were compensation for their preparation and submission of fraudulent PPP and COVID-19 EIDL loan applications, on numerous occasions, Defendant Porter and Defendant Holmon instructed their confederates to write false information in the memo line of the payments, such as that the payments were for equipment or consulting services.

11

59.     Defendant Porter and Defendant Holmon, in turn, paid Defendant Davis a portion of those fees as compensation for her assistance with preparing and submitting the fraudulent loan applications.

60.     Defendant Porter and Defendant Holmon directed their confederates, including Defendant Butler and Defendant Kelly, to refer to them other people who were seeking COVID-19 loan money so that Defendant Porter and Defendant Holmon, with the assistance of Defendant Davis, could prepare and submit fraudulent PPP and COVID-19 EIDL loan applications for those people's small businesses. On some occasions when a referral resulted in a fraudulent loan application being approved and funded, the confederate who made the referral to Defendant Porter and Defendant Holmon received a portion of the loan proceeds, either directly from the person whose business obtained the fraudulent loan or from Defendant Porter and Defendant Holmon after they received their fees for preparing and submitting the fraudulent loan application.

61.     So that Defendant Porter and Defendant Holmon, with the assistance of Defendant Davis, could prepare and submit fraudulent PPP and COVID-19 EIDL loan applications for their confederates' small businesses, Defendant Porter and Defendant Holmon requested their confederates' personally identifiable information, such as their confederates' dates of birth, social security numbers, and home addresses, as well as information about their confederates' businesses, such as their confederates' businesses' names, employer identification numbers, email addresses and passwords, and banking information.

62.     Defendant Porter and Defendant Holmon requested their confederates' businesses' email addresses and passwords so that Defendant Porter and Defendant Holmon could use the email addresses to impersonate their confederates while communicating with the SBA and third-party SBA lenders regarding their confederates' fraudulent PPP and COVID-19 EIDL loan

12

applications. On numerous occasions, including when their confederates did not have business email addresses, oftentimes because their confederates' businesses were not operational, Defendant Porter, Defendant Holmon, and Defendant Davis created fictitious email addresses for those businesses. In addition, Defendant Porter and Defendant Holmon also created fictitious email addresses for certain of their own businesses.

63. Further, on numerous occasions when the small businesses for which they prepared and submitted fraudulent PPP and COVID-19 EIDL loan applications did not have websites or bank accounts, Defendant Porter and Defendant Holmon created fictitious websites for those businesses to make it falsely appear that those businesses were operational, and opened, and instructed their confederates to open, business bank accounts for the sole purpose of using those accounts to receive electronic transfers of fraudulently obtained PPP and COVID-19 EIDL loan proceeds from the SBA and third-party SBA lenders.

64. In some instances when their confederates did not have small businesses, Defendant Davis registered sham businesses, such as Headliner's, for their confederates with the Missouri Secretary of State so that Defendant Davis, Defendant Porter, and Defendant Holmon could prepare and submit fraudulent PPP and COVID-19 EIDL loan applications for those businesses.

65. While preparing fraudulent PPP and COVID-19 EIDL loan applications for their confederates' small businesses, Defendant Porter and Defendant Holmon rarely requested information and supporting documentation relating to their confederates' businesses' average monthly payroll costs, gross income, or gross profit, even though, as Defendant Porter and Defendant Holmon knew, that information—and only that information—determined the PPP and COVID-19 EIDL loan amounts for which their confederates' businesses were potentially eligible.

13

66.     Some confederates for whom Defendant Porter, Defendant Holmon, and Defendant Davis prepared and submitted fraudulent PPP and COVID-19 EIDL loan applications, such as Defendant Butler, Defendant Kelly, and Defendant Sampson, knew that such information was required to be provided to the SBA and third-party SBA lenders as part of their small businesses' loan applications, and further knew that Defendant Porter and Defendant Holmon planned to falsify such information for their businesses' loan applications.

67.     Other people for whom Defendant Porter, Defendant Holmon, and Defendant Davis prepared and submitted fraudulent PPP and COVID-19 EIDL loan applications were unaware that such information was required to be provided to the SBA and third-party SBA lenders because Defendant Porter and Defendant Holmon concealed that requirement from them and provided them with false information, such as by telling them that eligibility for PPP and COVID-19 EIDL loans was determined based solely on the business owner's credit score.

68.     For each of the small businesses for which they prepared and submitted fraudulent PPP and COVID-19 EIDL loan applications, including their own businesses, Defendant Porter, Defendant Holmon, and Defendant Davis falsely inflated those businesses' average monthly payroll costs, gross income, or gross profit figures in the fraudulent loan applications to increase the loan amounts for which those businesses were eligible. But for those materially false representations regarding those businesses' payroll costs, gross income, or gross profit, none of those businesses would have been eligible for the PPP and COVID-19 EIDL loan amounts they obtained, and many would not have been eligible to obtain any PPP and COVID-19 EIDL loan money at all.

69.     When supporting documentation was required to be submitted with those fraudulent loan applications, Defendant Porter, Defendant Holmon, and Defendant Davis

14

\#

oftentimes created and supplied the SBA and third-party SBA lenders with falsified documents, such as falsified federal tax documents, falsified payroll records, falsified bank statements, and falsified invoices.

70.     In each of the fraudulent PPP and COVID-19 EIDL loan applications that Defendant Porter, Defendant Holmon, and Defendant Davis prepared and submitted for their own small businesses, they falsely represented that the loan proceeds would be used only for authorized purposes, despite knowing that they were going to use most, and sometimes all, of the loan proceeds for unauthorized purposes.

71.     In addition, in each of the fraudulent PPP and COVID-19 EIDL loan applications that Defendant Porter and Defendant Holmon, with the assistance of Defendant Davis, prepared and submitted for their confederates' small businesses, they falsely represented that the loan proceeds would be used only for authorized purposes, despite knowing that a portion of the loan proceeds would be used for the unauthorized purpose of paying the fees charged by Defendant Porter and Defendant Holmon for preparing and submitting the fraudulent loan applications.

72.     In numerous fraudulent PPP and COVID-19 EIDL loan applications that they prepared and submitted for their own small businesses, Defendant Porter, Defendant Holmon, and Defendant Davis concealed their majority ownership of those businesses by falsely representing that someone else was the majority owner of their businesses, such as by identifying the majority owner as one of their family members, in order to prevent the SBA and third-party SBA lenders from learning that they were the ones who would receive the loan proceeds if the applications were approved and funded. Likewise, in multiple fraudulent PPP and COVID-19 EIDL loan applications that they prepared and submitted for their confederates' small businesses, Defendant Porter, Defendant Holmon, and Defendant Davis falsely represented that someone other than their

15

confederates was the owner of those businesses, such as by identifying the owner as one of their confederates' family members or associates, including on occasions when their confederates' credit scores would have caused their confederates' businesses to be ineligible for PPP and COVID-19 EIDL loans.

73.     Further, in numerous fraudulent COVID-19 EIDL loan applications that Defendant Porter and Defendant Holmon, with the assistance of Defendant Davis, prepared and submitted for their own small businesses, as well as for the small businesses of their confederates, they listed Defendant Porter's information in the "preparer" section of the loan applications so that Defendant Porter could communicate directly with the SBA regarding the fraudulent loan applications, and in each of those fraudulent loan applications they falsely represented that Defendant Porter had charged a fee of $500 or less. In truth and in fact, Defendant Porter typically charged thousands of dollars in fees per fraudulent loan application.

74.     At Defendant Porter's direction, Defendant Kelly knowingly caused falsified federal tax documents to be filed with the IRS through her tax preparation business, The Firm, in an effort to conceal the fraudulent nature of the PPP and COVID-19 EIDL loans that Defendant Porter and Defendant Holmon obtained for certain of their own small businesses, as well as for certain of the small businesses of Defendant Butler, Defendant Kelly, and Defendant Sampson.

75.     For some of the fraudulent PPP loans that Defendant Porter and Defendant Holmon obtained for certain of their own small businesses, as well as those of their confederates, including Defendant Butler, Defendant Kelly, and Defendant Sampson, Defendant Porter and Defendant Holmon prepared and submitted to third-party SBA lenders fraudulent PPP loan forgiveness applications, including falsified supporting documentation, which in numerous instances resulted in the lenders approving the forgiveness applications and absolving Defendant Porter, Defendant

16

#

Holmon, and their confederates of having to repay any of the PPP loan proceeds that they fraudulently obtained.

### *The Scope of the Conspiracy*

76.    Defendant Porter and Defendant Holmon, with the assistance of Defendant Davis, prepared and submitted more than 40 fraudulent PPP and COVID-19 EIDL loan applications for their own small businesses and for their confederates' small businesses, including the businesses of Defendant Butler, Defendant Kelly, and Defendant Sampson, that were approved and funded by the SBA and third-party SBA lenders.

77.    Based on those fraudulent loan applications, the defendants and their confederates fraudulently obtained a total of more than $8 million in COVID-19 loan money, as follows:

| Applicant-Business | Loan Type | Lender | Loan Amount (Including Advances) |
|---|---|---|---|
| 84 Auto Salez | PPP (First Draw) | Seattle Bank | $59,083 |
| 84 Auto Salez | PPP (Second Draw) | Seattle Bank | $59,083 |
| Butler Group | COVID-19 EIDL | SBA | $887,900 |
| Chambers Park | PPP (First Draw) | Customers Bank | $144,411 |
| Cooper Consulting Firm | COVID-19 EIDL | SBA | $150,000 |
| Davaire Brands | COVID-19 EIDL | SBA | $85,700 |
| Davaire Brands | PPP (First Draw) | Milestone Bank | $44,995 |
| Deenbee | COVID-19 EIDL | SBA | $150,000 |
| Deenbee | PPP (First Draw) | First Bank of the Lake | $122,270 |
| Dela Crème Studio | COVID-19 EIDL | SBA | $71,500 |
| Design Retail | COVID-19 EIDL | SBA | $150,000 |
| Design Retail | PPP (First Draw) | Kabbage, Inc. | $48,803 |
| Design Retail | PPP (Second Draw) | Amur Equipment Finance, Inc. | $130,950 |
| Distinq'd | COVID-19 EIDL | SBA | $96,500 |
| Echelon Media | PPP (First Draw) | First Bank of the Lake | $266,148 |
| EZ ID Tags | COVID-19 EIDL | SBA | $64,300 |
| Global Watchdog | COVID-19 EIDL | SBA | $106,000 |
| Global Watchdog | PPP (First Draw) | Amur Equipment Finance, Inc. | $114,737 |
| Hazelwood Auto | COVID-19 EIDL | SBA | $150,000 |

17

#

| Applicant-Business | Loan Type | Lender | Loan Amount (Including Advances) |
|---|---|---|---|
| Headliner's | COVID-19 EIDL | SBA | $150,000 |
| IDA | COVID-19 EIDL | SBA | $122,300 |
| Inspired Lives Foundation | COVID-19 EIDL | SBA | $94,800 |
| J. Corley & Associates | COVID-19 EIDL | SBA | $150,000 |
| Jackson Engineering Consultants | COVID-19 EIDL | SBA | $84,500 |
| LA'z Unique Whips | COVID-19 EIDL | SBA | $122,300 |
| Mad Bird | COVID-19 EIDL | SBA | $150,000 |
| Mezzanine | COVID-19 EIDL | SBA | $150,000 |
| Napps | PPP (First Draw) | Customers Bank | $162,929 |
| OMG Labs | COVID-19 EIDL | SBA | $112,000 |
| Platform Health Care Solutions | PPP (First Draw) | First Bank of the Lake | $133,852 |
| Premium Prestigious | COVID-19 EIDL | SBA | $150,000 |
| Prince Collection | COVID-19 EIDL | SBA | $150,000 |
| Reign | PPP (First Draw) | Itria Ventures LLC | $397,210 |
| Right Care | COVID-19 EIDL | SBA | $500,000 |
| Saikap | COVID-19 EIDL | SBA | $500,000 |
| Salaam Enterprises | COVID-19 EIDL | SBA | $150,000 |
| Salsa Made Ridiculously Simple | COVID-19 EIDL | SBA | $24,100 |
| SFP Enterprises | COVID-19 EIDL | SBA | $390,500 |
| Simon Technologies | COVID-19 EIDL | SBA | $150,000 |
| Simon Technologies | PPP (First Draw) | Amur Equipment Finance, Inc. | $101,270 |
| South Side Vending | COVID-19 EIDL | SBA | $105,600 |
| State Street | COVID-19 EIDL | SBA | $150,000 |
| State Street | PPP (First Draw) | Northeast Bank | $133,852 |
| Swaggy Tags | COVID-19 EIDL | SBA | $500,000 |
| The Health Centers | COVID-19 EIDL | SBA | $500,000 |
| Unlimited 66 | COVID-19 EIDL | SBA | $150,000 |
| **TOTAL** | | | **$8,387,593** |

78.    Of the approximately $8 million in fraudulently obtained COVID-19 loan money, Defendant Porter and Defendant Holmon directly and personally received a total of more than $1.4 million of that money from the fraudulent PPP and COVID-19 EIDL loan applications that they prepared and submitted for their own small businesses, plus a total of more than $900,000 of that

18

\#

money through the fees that they charged their confederates for preparing and submitting fraudulent PPP and COVID-19 EIDL loan applications for their confederates' small businesses.

79.    After fraudulently obtaining that COVID-19 loan money, Defendant Porter, Defendant Holmon, Defendant Butler, Defendant Kelly, Defendant Sampson, and their confederates used most of that money for unauthorized purposes, including to, among other things, purchase personal vehicles, make personal payments to themselves, pay personal debts and bills, fund home renovations, buy designer merchandise, and cover expenses of businesses other than the ones to which the money was lent.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2–21
### (Wire Fraud: 18 U.S.C. §§ 1343 and 2)

80.    The above paragraphs are hereby realleged and incorporated by reference.

### *The Scheme*

81.    Beginning and ending at an exact time unknown, but including between in or around March 2020 and in or around December 2024, within the Eastern District of Missouri and elsewhere, the defendants, while being aided, abetted, counseled, encouraged, and induced by one another and others, known and unknown to the Grand Jury, and with the intent to defraud, knowingly, voluntarily, and intentionally devised, joined, and participated in a scheme and artifice to defraud the SBA and third-party SBA lenders, and to obtain money from the SBA and third-party SBA lenders by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, in relation to, and involving benefits authorized, transported, transmitted, transferred, disbursed, and paid in connection with, a presidentially declared major disaster and emergency (as those terms are defined in section 102 of

19

the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Title 42, United States Code, Section 5122)), as described above and below.

### The Manner and Means of the Scheme

82.    In addition to the same manner and means as the conspiracy described above, it was part of the scheme that:

Defendant Porter's Fraudulent COVID-19 Loans

83.    Defendant Porter, with the assistance of Defendant Holmon, submitted numerous fraudulent PPP and COVID-19 EIDL loan applications to the SBA and third-party SBA lenders for his small businesses, Design Retail, Hazelwood Auto, State Street, and Unlimited 66, including the following:

| Approximate Date | Applicant | Loan Type | Loan Amount (Including Advances) |
|---|---|---|---|
| March 30, 2020 | Design Retail | COVID-19 EIDL | $150,000 |
| July 8, 2020 | Design Retail | PPP (First Draw) | $48,803 |
| April 9, 2021 | Design Retail | PPP (Second Draw) | $130,950 |
| July 15, 2020 | Unlimited 66 | COVID-19 EIDL | $150,000 |
| August 25, 2020 | Hazelwood Auto | COVID-19 EIDL | $150,000 |
| September 3, 2020 | State Street | COVID-19 EIDL | $150,000 |
| April 21, 2021 | State Street | PPP (First Draw) | $133,852 |
| TOTAL | | | $913,605 |

84.    On or about March 30, 2020, Defendant Porter submitted a fraudulent COVID-19 EIDL loan application to the SBA for Design Retail. In that fraudulent loan application, Defendant Porter falsely inflated Design Retail's gross profit during the 12 months prior to January 31, 2020 and further falsely represented, among other things, that his son, rather than himself, was the majority owner of Design Retail. Defendant Porter listed himself in the "preparer" section of the fraudulent loan application so that he could communicate directly with the SBA regarding the application. As a condition of obtaining a COVID-19 EIDL loan for Design Retail, Defendant Porter forged his son's name on a loan authorization and agreement, in which Defendant Porter

20

#

falsely represented that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic. Further, to conceal the false representations about Design Retail's gross profit, after the fraudulent loan application was approved and just before Defendant Porter submitted a fraudulent COVID-19 EIDL loan modification request to the SBA, Defendant Porter directed Defendant Kelly to cause falsified federal tax documents for Design Retail to be filed with the IRS through her tax preparation business, The Firm, which she did.

85. On or about July 8, 2020, Defendant Porter submitted a fraudulent First Draw PPP loan application to third-party SBA lender Kabbage, Inc. ("Kabbage") for Design Retail. In that fraudulent loan application, Defendant Porter falsely inflated Design Retail's average monthly payroll costs, which he supported by supplying Kabbage with falsified federal tax documents, and further falsely represented, among other things, that his son, rather than himself, was the majority owner of Design Retail and that all loan proceeds would be used only for certain business-related purposes, specifically maintaining payroll and making lease and mortgage interest payments.

86. On or about April 9, 2021, Defendant Porter submitted a fraudulent Second Draw PPP loan application to third-party SBA lender Amur Equipment Finance, Inc. ("Amur") for Design Retail. In that fraudulent loan application, Defendant Porter falsely inflated Design Retail's average monthly payroll costs, which he supported by supplying Amur with falsified federal tax documents, and further falsely represented, among other things, that his son, rather than himself, was the majority owner of Design Retail and that Design Retail had used the full amount of its First Draw PPP loan only for eligible expenses and would similarly use the proceeds of its Second Draw PPP loan only for eligible expenses.

21

#

87.     On or about July 15, 2020, Defendant Porter submitted a fraudulent COVID-19 EIDL loan application to the SBA for Unlimited 66. In that fraudulent loan application, Defendant Porter falsely inflated Unlimited 66's gross profit during the 12 months prior to January 31, 2020 and further falsely represented, among other things, that his father, rather than himself, was the majority owner of Unlimited 66. As a condition of obtaining a COVID-19 EIDL loan for Unlimited 66, Defendant Porter forged his father's name on a loan authorization and agreement, in which Defendant Porter falsely represented that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic. Less than a week before submitting the fraudulent loan application, Defendant Porter opened a business bank account for Unlimited 66, for which he was the sole signatory. Further, on or about the same date that Defendant Porter submitted the fraudulent loan application, Defendant Holmon, at Defendant Porter's direction, created a fictitious website for Unlimited 66 to make it falsely appear that Unlimited 66 was operational.

88.     On or about August 25, 2020, Defendant Porter submitted a fraudulent COVID-19 EIDL loan application to the SBA for Hazelwood Auto. In that fraudulent loan application, Defendant Porter falsely inflated Hazelwood Auto's gross profit during the 12 months prior to January 31, 2020 and further falsely represented, among other things, that his wife, rather than himself, was the majority owner of Hazelwood Auto. Defendant Porter listed himself in the "preparer" section of the fraudulent loan application so that he could communicate directly with the SBA regarding the application. As a condition of obtaining a COVID-19 EIDL loan for Hazelwood Auto, Defendant Porter forged his wife's name on a loan authorization and agreement, in which Defendant Porter falsely represented that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic. Less than a week

22

#

before submitting the fraudulent loan application, Defendant Porter opened a business bank account for Hazelwood Auto, for which he was the sole signatory. Further, on or about the day before Defendant Porter submitted the fraudulent loan application, Defendant Holmon, at Defendant Porter's direction, created a fictitious website for Hazelwood Auto to make it falsely appear that Hazelwood Auto was operational.

89.    On or about September 3, 2020, Defendant Porter submitted a fraudulent COVID-19 EIDL loan application to the SBA for State Street. In that fraudulent loan application, Defendant Porter falsely inflated State Street's gross profit during the 12 months prior to January 31, 2020 and further falsely represented, among other things, that his mother, rather than himself, was the majority owner of State Street. Defendant Porter listed himself in the "preparer" section of the fraudulent loan application so that he could communicate directly with the SBA regarding the application. As a condition of obtaining a COVID-19 EIDL loan for State Street, Defendant Porter forged his mother's name on a loan authorization and agreement, in which Defendant Porter falsely represented that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic. Less than a week before submitting the fraudulent loan application, Defendant Porter opened a business bank account for State Street, for which he was the sole signatory. Further, less than a week before Defendant Porter submitted the fraudulent loan application, Defendant Holmon, at Defendant Porter's direction, created a fictitious website for State Street to make it falsely appear that State Street was operational.

90.    On or about April 21, 2021, Defendant Porter submitted a fraudulent First Draw PPP loan application for State Street to third-party SBA lender Northeast Bank. In that fraudulent loan application, Defendant Porter falsely inflated State Street's average monthly payroll costs, which he supported by supplying Northeast Bank with falsified federal tax documents, and further

23

#

falsely represented, among other things, that his mother, rather than himself, was the majority owner of State Street and that all loan proceeds would be used only for certain business-related purposes, specifically maintaining payroll and making payments for rent and utilities.

91.    Relying on the truth of Defendant Porter's false representations and fraudulent documentation, the SBA and the third-party SBA lenders approved each of those loan applications. Following the approval of those fraudulent loan applications, the SBA and the third-party SBA lenders electronically transferred a total of more than $900,000 in PPP and COVID-19 EIDL loan proceeds to the business bank accounts of Defendant Porter's businesses.

92.    Contrary to the material misrepresentations that Defendant Porter made regarding how his businesses' loan proceeds would be used, Defendant Porter used his fraudulently obtained loan proceeds for unauthorized purposes, including by transferring nearly all the proceeds of Hazelwood Auto, State Street, and Unlimited 66 to his personal Zelle account and to Design Retail's business bank account. Defendant Porter then used the proceeds to pay for personal expenses, such as renovation work on his personal residence, debt owed on his personal residence and an investment property, personal restaurant and grocery purchases, and personal bills.

93.    Defendant Porter later fraudulently applied for and received full forgiveness of each of the three PPP loans that he fraudulently obtained, meaning that he was relieved of the obligation to repay those PPP loans.

<u>Defendant Holmon's Fraudulent COVID-19 Loans</u>

94.    Defendant Holmon, with the assistance of Defendant Porter, submitted numerous fraudulent PPP and COVID-19 EIDL loan applications to the SBA and a third-party SBA lender for his small businesses, Davaire Brands, Mad Bird, Mezzanine, and OMG Labs, including the following:

24

#

| Approximate Date | Applicant | Loan Type | Loan Amount (Including Advances) |
|---|---|---|---|
| April 14, 2020 | Davaire Brands | COVID-19 EIDL | $85,700 |
| June 14, 2020 | Davaire Brands | PPP (First Draw) | $44,995 |
| June 20, 2020 | OMG Labs | COVID-19 EIDL | $112,000 |
| July 15, 2020 | Mezzanine | COVID-19 EIDL | $150,000 |
| August 3, 2020 | Mad Bird | COVID-19 EIDL | $150,000 |
| TOTAL | | | $542,695 |

95.     On or about April 14, 2020, Defendant Holmon submitted a fraudulent COVID-19 EIDL loan application to the SBA for Davaire Brands. In that fraudulent loan application, Defendant Holmon falsely inflated Davaire Brands' gross profit during the 12 months prior to January 31, 2020 and further falsely represented, among other things, that his mother, rather than himself, was the majority owner of Davaire Brands. As a condition of obtaining a COVID-19 EIDL loan for Davaire Brands, Defendant Holmon forged his mother's name on a loan authorization and agreement, in which Defendant Holmon falsely represented that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic. Further, to conceal the false representations about Davaire Brands' gross profit, after the fraudulent loan application was approved and just before Defendant Holmon submitted a fraudulent COVID-19 EIDL loan modification request to the SBA, Defendant Porter, with Defendant Holmon's knowledge and authorization, directed Defendant Kelly to cause falsified federal tax documents for Davaire Brands to be filed with the IRS through her tax preparation business, The Firm, which she did.

96.     On or about June 14, 2020, Defendant Holmon submitted a fraudulent First Draw PPP loan application to third-party SBA lender Milestone Bank for Davaire Brands. In that fraudulent loan application, Defendant Holmon falsely inflated Davaire Brands' average monthly payroll costs, which he supported by supplying the SBA with falsified federal tax documents, and further falsely represented, among other things, that his mother, rather than himself, was the

#

majority owner of Davaire Brands and that all loan proceeds would be used only for certain business-related purposes, specifically maintaining payroll and making payments for rent and utilities.

97.    On or about June 20, 2020, Defendant Holmon submitted a fraudulent COVID-19 EIDL loan application to the SBA for OMG Labs. In that fraudulent loan application, Defendant Holmon falsely inflated OMG Labs' gross profit during the 12 months prior to January 31, 2020. As a condition of obtaining a COVID-19 EIDL loan for OMG Labs, Defendant Holmon falsely represented in a loan authorization and agreement that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic.

98.    On or about July 15, 2020, Defendant Holmon submitted a fraudulent COVID-19 EIDL loan application to the SBA for Mezzanine. In that fraudulent loan application, Defendant Holmon falsely inflated Mezzanine's gross profit during the 12 months prior to January 31, 2020 and further falsely represented, among other things, that one of his associates, rather than himself, was the majority owner of Mezzanine. As a condition of obtaining a COVID-19 EIDL loan for Mezzanine, Defendant Holmon forged his associate's name on a loan authorization and agreement, in which Defendant Holmon falsely represented that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic. Less than a week before submitting the fraudulent loan application, Defendant Holmon opened a business bank account for Mezzanine, for which he was the sole signatory. Further, on or about the same date that Defendant Holmon submitted the fraudulent loan application, Defendant Holmon created a fictitious website for Mezzanine to make it falsely appear that Mezzanine was operational.

99.    On or about August 3, 2020, at Defendant Holmon's direction, Defendant Porter submitted a fraudulent COVID-19 EIDL loan application to the SBA for Mad Bird. As Defendant

26

\#

Holmon had instructed, in that fraudulent loan application, Defendant Porter falsely inflated Mad Bird's gross profit during the 12 months prior to January 31, 2020 and further falsely represented, among other things, that Defendant Holmon's father, rather than Defendant Holmon, was the majority owner of Mad Bird. Defendant Porter listed himself in the "preparer" section of the fraudulent loan application so that he could communicate directly with the SBA regarding the application. As a condition of obtaining a COVID-19 EIDL loan for Mad Bird, Defendant Porter, at Defendant Holmon's direction, forged Defendant Holmon's father's name on a loan authorization and agreement, in which Defendant Porter, with Defendant Holmon's knowledge and authorization, falsely represented that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic. Less than a week before causing Defendant Porter to submit the fraudulent loan application, Defendant Holmon opened a business bank account for Mad Bird, for which Defendant Holmon was the sole signatory. Further, less than a week before Defendant Holmon caused Defendant Porter to submit the fraudulent loan application, Defendant Holmon created a fictitious website for Mad Bird to make it falsely appear that Mad Bird was operational.

100. Relying on the truth of Defendant Holmon's false representations and fraudulent documentation, the SBA and third-party SBA lender Milestone Bank approved each of those loan applications. Following the approval of those fraudulent loan applications, the SBA and third-party SBA lender Milestone Bank electronically transferred a total of more than $500,000 in PPP and COVID-19 EIDL loan proceeds to the business bank accounts of Defendant Holmon's businesses and to one of Defendant Holmon's personal bank accounts.

101. Contrary to the material misrepresentations that Defendant Holmon made regarding how his businesses' loan proceeds would be used, Defendant Holmon used his fraudulently

27

obtained loan proceeds for unauthorized purposes, including to pay for personal expenses, such as debt owed on his personal residence and a personal vehicle purchase for nearly $100,000.

102.    Defendant Holmon later fraudulently applied for and received full forgiveness of the PPP loan that he fraudulently obtained, meaning that he was relieved of the obligation to repay that PPP loan.

<u>Defendant Butler's Fraudulent COVID-19 Loans</u>

103.    Defendant Butler caused Defendant Porter and Defendant Holmon to submit numerous fraudulent PPP and COVID-19 EIDL loan applications to the SBA and a third-party SBA lender for her small businesses, Butler Group and Echelon Media, including the following:

| Approximate Date | Applicant | Loan Type | Loan Amount (Including Advances) |
|---|---|---|---|
| July 8, 2020 | Butler Group | COVID-19 EIDL | $160,000 |
| February 10, 2022 | Butler Group | COVID-19 EIDL (Modification) | $350,000 |
| April 19, 2022 | Butler Group | COVID-19 EIDL (Modification) | $377,900 |
| April 22, 2021 | Echelon Media | PPP (First Draw) | $266,148 |
| **TOTAL** | | | **$1,154,048** |

104.    On or about July 8, 2020, Defendant Butler caused Defendant Holmon, with the assistance of Defendant Porter, to submit a fraudulent COVID-19 EIDL loan application to the SBA for Butler Group. As Defendant Butler knew would occur, in that fraudulent loan application, Defendant Holmon falsely inflated Butler Group's gross profit during the 12 months prior to January 31, 2020, which he supported by supplying the SBA with falsified federal tax documents. In connection with the fraudulent loan application, Defendant Holmon also created a fictitious email address for Butler Group, which Defendant Holmon listed in the application as Defendant Butler's email address so that he could communicate directly with the SBA regarding the application. Further, as a condition of obtaining a COVID-19 EIDL loan for Butler Group,

28

#

Defendant Holmon, with Defendant Butler's knowledge and authorization, falsely represented in a loan authorization and agreement that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic.

105.    On or about February 10, 2022, Defendant Butler caused Defendant Porter to submit a fraudulent COVID-19 EIDL loan modification request to the SBA for Butler Group. As part of the fraudulent modification request, and with Defendant Butler's knowledge and authorization, Defendant Porter supplied the SBA with a second set of falsified federal tax documents that falsely inflated Butler Group's gross profit during the 12 months prior to January 31, 2020. To conceal the false representations made in the original loan application about Butler Group's gross profit and to increase the likelihood that the fraudulent modification request would be approved, before Defendant Porter submitted the modification request, Defendant Porter directed Defendant Kelly to cause falsified federal tax documents for Butler Group to be filed with the IRS through her tax preparation business, The Firm, which she did.

106.    On or about April 19, 2022, Defendant Butler caused Defendant Porter to submit a second fraudulent COVID-19 EIDL loan modification request to the SBA for Butler Group. As part of the second fraudulent modification request, and with Defendant Butler's knowledge and authorization, Defendant Porter supplied the SBA with numerous falsified documents, such as falsified invoices and a third set of falsified federal tax documents that falsely inflated Butler Group's gross profit during the 2020 calendar year. After the second fraudulent modification request was approved, Defendant Porter directed Defendant Kelly to cause more falsified federal tax documents for Butler Group to be filed with the IRS through her tax preparation business, The Firm, which she did.

29

107.    On or about April 22, 2021, Defendant Butler caused Defendant Porter, with the assistance of Defendant Davis, to submit a fraudulent First Draw PPP loan application to third-party SBA lender First Bank of the Lake for Echelon Media. As Defendant Butler knew would occur, in that fraudulent loan application, Defendant Porter falsely inflated Echelon Media's average monthly payroll costs, which he supported by supplying First Bank of the Lake with falsified federal tax documents, and further falsely represented, among other things, that all loan proceeds would be used only for certain business-related purposes, specifically maintaining payroll and making payments for rent, utilities, and operations expenses.

108.    Acting in reliance on the truth of Defendant Butler, Defendant Porter, Defendant Holmon, and Defendant Davis's false representations and fraudulent documentation, the SBA and third-party SBA lender First Bank of the Lake approved each of those loan applications and modification requests. Following the approval of those fraudulent loan applications and modification requests, the SBA and third-party SBA lender First Bank of the Lake electronically transferred a total of more than $1 million in PPP and COVID-19 EIDL loan proceeds to the business bank accounts of Defendant Butler's businesses.

109.    After fraudulently obtaining more than $1 million in PPP and COVID-19 EIDL loan proceeds, Defendant Butler used her loan proceeds for unauthorized purposes, including to fund expenses of Gospel Music Hall of Fame, to pay more than $200,000 of preparer fees to Defendant Porter and Defendant Holmon, and to pay for personal expenses, such as personal vehicles and other personal purchases at restaurants and designer retail stores like Gucci.

110.    Defendant Butler, with the assistance of Defendant Porter, later fraudulently applied for full forgiveness of the PPP loan that she fraudulently obtained. Had First Bank of the

\#

Lake not denied that fraudulent forgiveness application, Defendant Butler would have been relieved of the obligation to repay that PPP loan.

<u>Defendant Kelly and Defendant Sampson's Fraudulent COVID-19 Loans</u>

111.    Defendant Kelly and Defendant Sampson, with the assistance of Defendant Porter, caused numerous fraudulent PPP and COVID-19 EIDL loan applications to be submitted to the SBA and a third-party SBA lender for their small business, Reign, including the following:

| Approximate Date | Applicant | Loan Type | Loan Amount (Including Advances) |
|---|---|---|---|
| January 5, 2021 | Reign | COVID-19 EIDL | $150,000 (denied) |
| February 11, 2021 | Reign | PPP (First Draw) | $397,210 |
| November 4, 2021 | Reign | COVID-19 EIDL | $1,029,400 (denied) |
| **TOTAL** | | | **$1,576,610 ($397,210 funded)** |

112.    On or about January 5, 2021, Defendant Kelly and Defendant Sampson caused Defendant Porter to submit a fraudulent COVID-19 EIDL loan application to the SBA for Reign. With Defendant Kelly and Defendant Sampson's knowledge and authorization, in that fraudulent loan application, Defendant Porter falsely inflated Reign's gross profit during the 12 months prior to January 31, 2020—when Reign was not even operating—and further falsely represented, among other things, that Defendant Sampson was the 85% owner of Reign. Defendant Porter listed himself in the "preparer" section of the loan application so that he could communicate directly with the SBA regarding the application. Had the SBA not denied that fraudulent loan application, Defendant Kelly and Defendant Sampson would have fraudulently obtained $150,000 in COVID-19 EIDL loan proceeds.

113.    On or about February 11, 2021, Defendant Kelly and Defendant Sampson caused Defendant Porter to submit a fraudulent First Draw PPP loan application to third-party SBA lender Itria Ventures LLC ("Itria Ventures") for Reign. With Defendant Kelly and Defendant Sampson's

knowledge and authorization, in that fraudulent loan application, Defendant Porter falsely inflated Reign's average monthly payroll costs, which he supported by supplying Itria Ventures LLC with falsified federal tax documents, concealed that Defendant Kelly owned 20% or more of the equity in Reign, and further falsely represented, among other things, that Reign was in operation on February 15, 2020, that Defendant Sampson was the 70% owner of Reign, and that all loan proceeds would be used only for certain business-related purposes, specifically maintaining payroll and making payments for rent and utilities.

114.    On or about November 4, 2021, Defendant Kelly and Defendant Sampson caused Defendant Porter to submit another fraudulent COVID-19 EIDL loan application to the SBA for Reign. With Defendant Kelly and Defendant Sampson's knowledge and authorization, in that fraudulent loan application, Defendant Porter falsely inflated Reign's gross profit during the 2020 calendar year, which he supported by supplying the SBA with falsified federal tax documents, and further falsely represented, among other things, that Defendant Kelly was the 90% owner of Reign. Defendant Porter listed himself in the "preparer" section of the loan application so that he could communicate directly with the SBA regarding the application. Before Defendant Porter submitted the loan application, Defendant Kelly caused falsified federal tax documents for Reign to be filed with the IRS through her tax preparation business, The Firm. Had the SBA not denied that fraudulent loan application, Defendant Kelly and Defendant Sampson would have fraudulently obtained more than $1 million in COVID-19 EIDL loan proceeds.

115.    Acting in reliance on the truth of Defendant Kelly, Defendant Sampson, and Defendant Porter's false representations and fraudulent documentation, third-party SBA lender Itria Ventures approved the fraudulent PPP loan application. Following the approval of that fraudulent loan application, third-party SBA lender Itria Ventures electronically transferred a total

32

of more than $300,000 in PPP loan proceeds to the business bank account of Defendant Kelly and Defendant Sampson's business, Reign.

116.    After fraudulently obtaining more than $300,000 in PPP loan proceeds, Defendant Kelly and Defendant Sampson used at least half of those proceeds for unauthorized purposes, including by paying more than $30,000 of preparer fees to Defendant Porter and disbursing more than $100,000 to Defendant Sampson's personal bank accounts.

117.    Defendant Kelly and Defendant Sampson, with the assistance of Defendant Porter, later fraudulently applied for full forgiveness of the PPP loan that they fraudulently obtained. Had Itria Ventures not denied that fraudulent forgiveness application, Defendant Kelly and Defendant Sampson would have been relieved of the obligation to repay the PPP loan.

### Defendant Davis's Fraudulent COVID-19 Loan

118.    On or about August 1, 2020, Defendant Davis caused Defendant Holmon to submit a fraudulent COVID-19 EIDL loan application to the SBA for her small business, Distinq'd. As Defendant Davis knew would occur, in that fraudulent loan application, Defendant Holmon falsely inflated Distinq'd's gross profit during the 12 months prior to January 31, 2020 and further falsely represented, among other things, that Defendant Davis's grandmother, rather than Defendant Davis, was the majority owner of Distinq'd. As a condition of obtaining a COVID-19 EIDL loan for Distinq'd, Defendant Holmon, with Defendant Davis's knowledge and authorization, falsely represented in a loan authorization and agreement that all loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic. Before causing Defendant Holmon to submit the fraudulent loan application, Defendant Davis opened a business bank account for Distinq'd, for which she was the sole signatory.

33

\#

119.    Relying on the truth of Defendant Davis's false representations, the SBA approved that fraudulent loan application. Following the approval of that fraudulent loan application, the SBA electronically transferred a total of more than $95,000 in COVID-19 EIDL loan proceeds to the business bank account of Defendant Davis's business, Distinq'd.

120.    After fraudulently obtaining more than $95,000 in COVID-19 EIDL loan proceeds, Defendant Davis used her loan proceeds for unauthorized purposes, including by at least $20,000 of preparer fees to Defendant Holmon and paying for personal expenses, such as personal purchases at restaurants and designer retail stores like Louis Vuitton.

### *The Interstate Wire Transmissions*

121.    On or about the dates set forth below, within the Eastern District of Missouri and elsewhere, the defendants specified below, for the purpose of executing and attempting to execute the above-described scheme and artifice, transmitted, and caused to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, as follows:

| Count | Defendants | Approximate Date | Wire Description |
|---|---|---|---|
| 2 | Porter | March 30, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for Design Retail, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 3 | Porter | July 8, 2020 | Electronic submission of fraudulent First Draw PPP loan application to Kabbage for Design Retail, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 4 | Porter | April 9, 2021 | Electronic submission of fraudulent Second Draw PPP loan application to Amur for Design Retail, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 5 | Porter Holmon | July 15, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for Unlimited 66, which traveled through an out-of-state server from the Eastern District of Missouri. |

34

| Count | Defendants | Approximate Date | Wire Description |
|---|---|---|---|
| 6 | Porter Holmon | August 25, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for Hazelwood Auto, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 7 | Porter Holmon | September 3, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for State Street, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 8 | Porter | April 21, 2021 | Electronic submission of fraudulent First Draw PPP loan application to Northeast Bank for State Street, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 9 | Holmon | April 14, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for Davaire Brands, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 10 | Holmon | June 14, 2020 | Electronic submission of fraudulent First Draw PPP loan application to Milestone Bank for Davaire Brands, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 11 | Holmon | June 20, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for OMG Labs, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 12 | Holmon | July 15, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for Mezzanine, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 13 | Porter Holmon | August 3, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for Mad Bird, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 14 | Porter Holmon Butler | July 8, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for Butler Group, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 15 | Porter Butler | February 10, 2022 | Electronic submission of fraudulent COVID-19 EIDL loan modification request to the SBA for Butler Group, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 16 | Porter Butler | April 19, 2022 | Electronic submission of second fraudulent COVID-19 EIDL loan modification request to the SBA for Butler Group, which traveled through an out-of-state server from the Eastern District of Missouri. |

35

| Count | Defendants | Approximate Date | Wire Description |
|---|---|---|---|
| 17 | Porter Butler Davis | April 22, 2021 | Electronic submission of fraudulent First Draw PPP loan application to First Bank of the Lake for Echelon Media, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 18 | Porter Kelly Sampson | January 5, 2021 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for Reign, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 19 | Porter Kelly Sampson | February 11, 2021 | Electronic submission of fraudulent First Draw PPP loan application to Itria Ventures for Reign, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 20 | Porter Kelly Sampson | November 4, 2021 | Electronic submission of second fraudulent COVID-19 EIDL loan application to the SBA for Reign, which traveled through an out-of-state server from the Eastern District of Missouri. |
| 21 | Holmon Davis | August 1, 2020 | Electronic submission of fraudulent COVID-19 EIDL loan application to the SBA for Distinq'd, which traveled through an out-of-state server from the Eastern District of Missouri. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

**COUNTS 22–33**
**(Aggravated Identity Theft: 18 U.S.C. §§ 1028A and 2)**

122.    The above paragraphs are hereby realleged and incorporated by reference.

123.    On or about the dates set forth below, within the Eastern District of Missouri and elsewhere, the defendants specified below, while being aided, abetted, counseled, encouraged, and induced by one another and others, known and unknown to the Grand Jury, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), that being wire fraud in violation of 18 U.S.C. §§ 1343 and 2, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, described below for each count, knowing that the means of identification belonged to another actual person:

| Count | Defendants | Approximate Date | Means of Identification |
|---|---|---|---|
| 22 | Porter | March 30, 2020 | Name, date of birth, and social security number of T.P. used in fraudulent Design Retail COVID-19 EIDL loan application. |
| 23 | Porter | July 8, 2020 | Name and social security number of T.P. used in fraudulent Design Retail First Draw PPP loan application. |
| 24 | Porter | April 9, 2021 | Name and social security number of T.P. used in fraudulent Design Retail Second Draw PPP loan application. |
| 25 | Porter | July 15, 2020 | Name, date of birth, and social security number of R.P. used in fraudulent Unlimited 66 COVID-19 EIDL loan application. |
| 26 | Porter | August 25, 2020 | Name, date of birth, and social security number of D.P. used in fraudulent Hazelwood Auto COVID-19 EIDL loan application. |
| 27 | Porter | September 3, 2020 | Name, date of birth, and social security number of A.P. used in fraudulent State Street COVID-19 EIDL loan application. |
| 28 | Porter | April 21, 2021 | Name and social security number of A.P. used in fraudulent State Street First Draw PPP loan application. |
| 29 | Holmon | April 14, 2020 | Name, date of birth, and social security number of I.H. used in fraudulent Davaire Brands COVID-19 EIDL loan application. |
| 30 | Holmon | June 14, 2020 | Name and social security number of I.H. used in fraudulent Davaire Brands First Draw PPP loan application. |
| 31 | Holmon | July 15, 2020 | Name, date of birth, and social security number of M.M. used in fraudulent Mezzanine COVID-19 EIDL loan application. |
| 32 | Holmon Porter | August 3, 2020 | Name, date of birth, and social security number of D.H. used in fraudulent Mad Bird COVID-19 EIDL loan application. |
| 33 | Holmon Davis | August 1, 2020 | Name, date of birth, and social security number of H.B. used in fraudulent Distinq'd COVID-19 EIDL loan application. |

All in violation of Title 18, United States Code, Sections 1028A and 2.

#

## COUNTS 34–47
### (Money Laundering: 18 U.S.C. §§ 1957 and 2)

124. The above paragraphs are hereby realleged and incorporated by reference.

125. On or about the dates set forth below, within the Eastern District of Missouri and elsewhere, the defendants specified below, while being aided, abetted, counseled, encouraged, and induced by one another and others, known and unknown to the Grand Jury, knowingly engaged and attempted to engage in monetary transactions by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is, the issuance of checks drawn on federally insured financial institutions, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, as follows:

| Count | Defendants | Approximate Date | Transaction |
|---|---|---|---|
| 34 | Porter | July 28, 2020 | Check No. 5051 in the amount of $15,000 drawn on Design Retail's Bank of America account **2963 payable to Jon Fuhrer & Company for a loan secured by Defendant Porter's personal residence. |
| 35 | Porter | September 29, 2020 | PNC Bank Cashier's Check No. 334224 in the amount of $22,000 funded by withdrawal from Hazelwood Auto's PNC Bank account **3761 payable to Design Retail. |
| 36 | Porter | September 30, 2020 | US Bank Cashier's Check No. 6960514718 in the amount of $25,200 funded by withdrawal from Unlimited 66's US Bank account **2987 payable to Design Retail. |
| 37 | Porter | September 30, 2020 | Triad Bank Cashier's Check No. 009143 in the amount of $27,250 funded by withdrawal from State Street's Triad Bank account **9718 payable to Design Retail. |
| 38 | Holmon | April 11, 2022 | US Bank Cashier's Check No. 8407521365 in the amount of $359,100 funded by withdrawal from Mezzanine's US Bank account **2979 payable to Mad Bird. |
| 39 | Holmon | November 29, 2022 | Commerce Bank Cashier's Check No. 0081333587 in the amount of $98,000 funded by withdrawal from Mad Bird's Commerce Bank account **1244 payable to Porsche St. Louis for the purchase of a 2020 Aston Martin Vantage. |

38

| Count | Defendants | Approximate Date | Transaction |
|---|---|---|---|
| 40 | Butler | July 31, 2020 | Enterprise Bank & Trust Cashier's Check No. 441074 in the amount of $19,000 funded by withdrawal from Butler Group's Enterprise Bank & Trust account **0160 payable to Davaire Brands. |
| 41 | Butler | September 2, 2020 | Enterprise Bank & Trust Cashier's Check No. 441204 in the amount of $29,800 funded by withdrawal from Butler Group's Enterprise Bank & Trust account **0160 payable to Davaire Brands. |
| 42 | Butler | April 22, 2021 | Check No. 5201 in the amount of $79,844.70 drawn on Echelon Media's Simmons Bank account **7182 payable to Design Retail for "equipment." |
| 43 | Butler | April 27, 2021 | Simmons Bank Cashier's Check No. 202240225 in the amount of $60,000 funded by withdrawal from Echelon Media's Simmons Bank account **7182 payable to Butler Group. |
| 44 | Butler | March 16, 2022 | Check No. 1080 in the amount of $30,000 drawn on Butler Group's Enterprise Bank & Trust account **0160 payable to Gospel Music Hall of Fame for a "donation." |
| 45 | Butler | March 26, 2022 | Check No. 1091 in the amount of $35,000 drawn on Butler Group's Enterprise Bank & Trust account **0160 payable to Design Retail for "services." |
| 46 | Butler | April 27, 2022 | Enterprise Bank & Trust Cashier's Check No. 473724 in the amount of $70,000 funded by withdrawal from Butler Group's Enterprise Bank & Trust **0160 payable to Design Retail. |
| 47 | Kelly Sampson | February 22, 2021 | Check No. 1064 in the amount of $39,721 drawn on Reign's Bank of America account **7025 payable to Design Retail (under the d/b/a Heartland POS) for "POS Equipment." |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE ALLEGATION

The Grand Jury further alleges there is probable cause that:

1.      Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, upon conviction of an offense in violation of Title 18, United States Code, Section 1343 and Section 1349, as set forth in Counts 1 through 21 above, the defendant(s) shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to such violation(s). Subject to forfeiture is a sum of money equal

39

to the total value of any property, real or personal, which constitutes or is derived from proceeds traceable to such violation(s).

2.      Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1957, as set forth in Counts 34 through 47 above, the defendant(s) shall forfeit to the United States of America any property, real or personal, involved in such offense, or any property traceable to such property. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, involved in such offense, or any property traceable to such property

3.      Specific property subject to forfeiture includes, but is not limited to, the following:

     a.      7801 Olive Boulevard, St. Louis, Missouri 63130;

     b.      7805 Olive Boulevard, St. Louis, Missouri, 63130;

     c.      9691 Huron Drive, St. Louis, Missouri 63132;

     d.      5623 Bartmer Avenue, St. Louis, Missouri 63112;

     e.      2020 Aston Martin Vantage, VIN: SCFSMGAW4LGN03732;

     f.      2019 Mercedes Sprinter Van, VIN: WDZPF0CD0KP118510; and

     g.      2021 Cadillac Escalade, VIN: 1GYS4MKL2MR195431.

4.      If any of the property described above, as a result of any act or omission of the defendant(s):

     a.      cannot be located upon the exercise of due diligence;

     b.      has been transferred or sold to, or deposited with, a third party;

     c.      has been placed beyond the jurisdiction of the court;

     d.      has been substantially diminished in value; or

#

e.       has been commingled with other property which cannot be divided without

difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____

FOREPERSON

THOMAS C. ALBUS
United States Attorney

_____

JUSTIN M. LADENDORF #68558MO
Assistant United States Attorney

41

#